UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JERALD LEROY WINGEART,

                    Petitioner,                            Case No. 05-74144
                                                            Honorable David M. Lawson

v.

MILLICENT WARREN,

                    Respondent.

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

On October 28, 2005, the petitioner Jerald Leroy Wingeart filed an amended petition for a writ of habeas corpus under 28 U.S.C. § 2254, alleging that his 1973 conviction for the murder of twenty-year-old Dawn Magyar is unconstitutional. The petitioner was convicted by a Michigan jury on November 28, 2001, twenty-eight years after Magyar was murdered. He contends that his first-degree murder conviction and life prison sentence are unconstitutional because: (1) his rights under the Confrontation Clause were violated when the trial court admitted two hearsay statements concerning destroyed business records that established a chain of custody for a revolver that he allegedly used to murder Magyar after abducting her and raping her; (2) the trial judge was biased because he was an assistant prosecutor in 1974 and then the prosecutor before becoming a judge in 1985; (3) trial counsel was ineffective by failing to move to disqualify the trial judge; and (4) appellate counsel was ineffective by failing to raise the disqualification claim in his direct appeal. The respondent filed an answer to the petition arguing that the petitioner's claims are procedurally defaulted and lack merit. The Court finds that the claims lack merit and therefore will deny the petition.

I.

The petitioner was tried in Shiawassee County, Michigan, but by a jury selected from a venire in Livingston County.  The location of the homicide was unknown but suspected to have occurred within a mile of the boundary between Livingston and Shiawassee Counties.  Therefore, Michigan's attorney general designated Shiawassee County as the appropriate venue in which to prosecute the crime.  However, because of publicity concerns, the Shiawassee County judge selected jurors from the neighboring county.

The jury convicted the petitioner of both species of first-degree murder: premeditated murder and felony murder.  At the prosecution's request, the trial judge vacated the premeditated murder count to avoid double-jeopardy concerns.  The Michigan Court of Appeals provided the following truncated summary of the facts:

> On January 27, 1973, the victim left her home to go shopping.  On the way she experienced car trouble, so after stopping at a gas station for assistance, she drove to her in-laws' residence, got her father-in-law's pickup truck, and proceeded to shop at a number of stores.  The truck was found in the Yankee Plaza parking lot in Owosso.  Some of the victim's keys were on the floorboard and some were on the ground.  Searches for the victim were unsuccessful.
>
> On March 4, 1973, an eleven-year-old boy found the victim's body, which was identified through dental records and fingerprints, over fourteen miles north and west of Owosso in the woods near a trail.  The victim had sustained three gunshot wounds.  She was shot twice in the head and once in the back, and .22 caliber bullets were recovered from her body.  The date and time of death could not be determined.
>
> On June 9, 1974, a rusted Rohm .22 caliber revolver believed to be the murder weapon was recovered submerged in water on a dam in a river in Owosso.  Specifically, the gun was found between 100 and 150 feet north of the M-21 bridge of the Shiawassee River.  The police ascertained that a pawnshop in Arizona sold the gun to Robert Shaw, but at that time could not locate the buyer.  Because of the rusted condition of the gun, no fingerprints were recovered, and because of the inoperable condition of the gun, it could not be determined through test firing whether the bullets in the victim came from the gun found.  Years later, on August

25, 1976, a couple of boys found the victim's wallet in Owosso on the west riverbank on the south side of the M-21 bridge over the Shiawassee river.

Throughout the many years of investigation, the police investigated numerous suspects. But many suspects were excluded for various reasons, including DNA analysis. In 1994, DNA analysis indicated that the sperm taken by vaginal swab from the victim's body matched defendant's DNA profile and defendant was charged and tried for murdering the victim. After deliberations, the jury rendered its verdict, finding defendant guilty of first-degree felony murder and first-degree premeditated murder. At sentencing, the trial court vacated the premeditated murder conviction and then sentenced defendant to life imprisonment without parole for the felony murder conviction.

*People v. Wingeart*, No. 240697, 2003 WL 22204991, at *1 (Mich. Ct. App. Sept. 23, 2003).

The following additional facts from the trial record are pertinent to the issues raised in the petition.

Ilene Helmka, a cashier at the Giant Supermarket at the Yankee Plaza on Owosso, waited on Magyar on the day she disappeared. Helmka testified that Magyar was a regular at the store. Helmka said she talked to Magyar briefly. Magyar was in a hurry to pick up her son from her mother's house. On the basis of Helmka's description, the police prepared a sketch of a man who was in the store at the same time as Magyar. Helmka described the man as having big eyes and said he was pacing back and forth.

Magyar's friend, Janice Simpson, was at the grocery store at the same time. They talked only briefly because Magyar was in a hurry to get home. According to Simpson, Magyar was wearing a brown jacket with fringe and blue pants. She had her hair pulled up with a red scarf and was carrying a brown leather or suede shoulder bag.

On March 4, 1973, over five weeks after Magyar's disappearance, eleven-year-old Wayne Somers found her body on his family's farm, about fourteen miles from Owosso. Photographs of that area and Magyar's body were admitted at the petitioner's trial. Magyar's frozen body was

-3-

found face down with her right arm behind her back in a hammerlock position about 200 feet from a circular two-track. Her left arm, like her right arm, was inside her leather jacket but not inside its sleeve. It appeared that her jacket had been used as a "straight jacket." Her face was unrecognizable because animals "had chewed on her." She had been shot twice behind her left ear and once in her back. Her still-fastened bra had been cut between the cups in the front. She was identified by using dental records and fingerprints. Detective Bartrim Barnes of the Michigan State Police testified that he took Magyar's wedding ring to a jeweler, where it was identified as hers by a hidden number.

Dr. John Edward Finger performed the autopsy on Magyar's body on March 5, 1973. Dr. Finger confirmed that she had been shot twice in the head and once in the back. Her back wound was a contact wound and her head wounds were inflicted at close range. The shot to her back penetrated her heart. Three .22-caliber bullets, including one Winchester and two Remingtons, were recovered from her body. No drugs or alcohol were found in her blood. Dr. Finger took vaginal swabs from her and examined them under a microscope, finding sperm. The police also took four vaginal swabs and smears, two blood samples, and the recovered bullets, along with additional samples. Although Dr. Finger could not pinpoint the time of death, he opined that Magyar could have been murdered on the day she disappeared because of the constant freezing temperatures in the time between her disappearance and the discovery of her body. Magyar's clothing and the samples were admitted at trial.

On June 9, 1974, more than a year after Magyar's body was discovered, thirteen-year-old

Jay Patten found a rusted Rohm .22-caliber revolver near a dam on the Shiawassee River.  The Shiawassee River was less than two miles from the Yankee Plaza.  Patten and his friends gave the gun to the police.  There were no fingerprints on the gun.

Based on earlier comparisons, the police believed that the gun used to murder Magyar was either a Rohm or a Roscoe.  Almost one month later, Detective Barnes managed to get the rusted Rohm open by using gun solvent.  Inside, he discovered three shell casings, a misfired bullet and two bullets; one of the fired shell casings was a Winchester and the other two were Remingtons.  Those shell casings were consistent with the slugs recovered from Magyar's body.  Detective Barnes also retrieved the Rohm's serial number and gave it to Bureau of Alcohol, Tobacco & Firearms (AFT) Agent James Marinelli.  Agent Marinelli told him that the gun was manufactured in Germany, shipped to the Saligen Liberty Arms Company in California, and sold to Jim's Pawn Shop in Yuma, Arizona.  Jim's Pawn Shop had gone out of business and its owner, Jim Stone, had moved to Panama City, Florida.

Sergeant Lewis Joseph Hallford from the Panama City Police Department testified with respect to an August 28, 1974 letter dealing with the firearm trace.  Hallford could not remember preparing the letter, but it was admitted over objection.  Hallford read the letter into the record.  The letter stated that Hallford had interviewed Jim Stone about his pawn shop in Yuma, Arizona, and that Stone told him that he located the ticket on the pistol in question, and that the gun was sold to a Robert Shaw in Yuma.

Detective Barnes attempted to locate Shaw but was unsuccessful.

-5-

On August 25, 1976, Richard Ketchum, along with another boy, found Magyar's billfold on the south side of the Shiawassee River's bank. The billfold contained Magyar's driver's license and social security card. Both were admitted into evidence. The .22-caliber Rohm and wallet were found approximately 150 to 200 feet apart.

During the years that Detective Barnes investigated Magyar's murder, the petitioner's name never came up. Detective Barnes eventually retired.

In 1994, Michigan State Police Sergeant Gayle VanLopik Toben was asked to look at all the unsolved murders at the Owosso post. Sergeant Toben came across Magyar's case, thought DNA testing would be possible, and requested permission for funds to do the testing. Those results came back on June 4, 1996. Sergeant Toben was transferred in 1998.

In 1998, Michigan State Police Sergeants Mark Pendergraff and Steven Harshberger became involved in the investigation. Sergeant Pendergraff tried to locate Robert Shaw. He also tried to obtain a paper trail for the .22-caliber Rohm through ATF. The Rohm was purchased in 1965, before the 1968 Gun Control Act went into effect, which required handguns to be registered. ATF maintained its records for only twenty years, and therefore there were no records from 1965.

Sergeant Harshberger located a Robert Shaw in Mason, Michigan. He had lived in Yuma, Arizona during the 1960s. The police told Shaw that they found a Rohm and wanted to return it to its original owner. Shaw provided a blood sample and was cooperative with police. Although he initially had trouble recalling what had happened to the Rohm, he eventually was able to provide Sergeants Harshberger and Pendergraff with the petitioner's name.

Shaw testified that from 1964 until 1966, he was in the Army, serving as a military police officer in Yuma, Arizona. He bought a .22-caliber Rohm to use for target practice. He did not

remember where he bought the gun but thought it was from a pawn shop in Yuma.  He identified the gun found at the Shiawassee River as being similar to the gun he had purchased.

When the police came to Shaw in 1999, he told them he thought he might have traded the gun to his boss or another man that owned a pawn shop.  Shaw's former boss agreed that he traded Shaw an automatic pistol for a .22-caliber gun, but said Shaw's gun was a different brand than a Rohm.  Shaw also recalled looking for his .22-caliber Rohm at one point in time and not finding it.  At the time that he had the .22-caliber Rohm, he was married to Darlene Rossow.  They separated in 1968 and divorced in 1969.  He said she took some furniture from their apartment.  He was not present at the time.  Shaw said he did not give his .22-caliber Rohm to the petitioner.  He said he could have put the .22-caliber Rohm in a drawer or junk box because he did not think it was worth anything.

Sergeants Pendergraff and Harshberger then learned that the petitioner had been convicted of rape and armed robbery in 1961.  Pendergraff obtained the  preliminary examination transcript from the petitioner's earlier case.  There were similarities between Magyar's case and the rape of the petitioner's earlier victim, Karen Evans.

Darlene Rossow testified that she married Robert Shaw in 1964 and they moved to Yuma, Arizona.  They returned to Michigan in 1966 when Shaw was discharged from the Army.  She never saw him with any guns.  After they returned to Michigan, Rossow became involved with other men, including the petitioner.  She met the petitioner between1967 and 1969.  She divorced Shaw in 1969 and married the petitioner in 1970.

According to Rossow, the petitioner was never at the house she had shared with Shaw.  She agreed that she took furnishings from the house she had shared with Shaw and moved in with a

-7-

female friend, and thereafter the petitioner. She confirmed that the petitioner was an avid hunter but denied ever seeing him with a pistol.

John Patterson was a friend of the petitioner and had lived in Owosso from the late 1960s through 1974. He and the petitioner hunted together. The petitioner liked to go for rides in the country and cruise. At that time, the petitioner owned a red Thunderbird and a dark Chevy.

Ronald Wingeart, the petitioner's brother, testified that the petitioner was familiar with firearms, including .22s because he had one; the petitioner also carried a knife when he hunted.

The petitioner's friend and former co-worker, Tony Bennett, testified that he met the petitioner in 1967. In 1971 or 1972, the petitioner came to Bennett's house with a small handgun and shot some cans. The petitioner drove a 1969 Chevy Impala that was brown or red, and later a Thunderbird.

Sergeants Pendergraff and Harshberger began conducting surveillance on the petitioner, hoping to obtain a DNA sample by waiting for him to discard his chewing gum or a cigarette butt or even a pop can. They were unsuccessful in obtaining a DNA sample through their surveillance. However, Sergeant Pendergraff learned that the petitioner smoked cigarettes. They then did a trash pull at the petitioner's house on November 8, 2000. Sergeant Pendergraff found thirty-two cigarette butts, seven pop cans, and some used tissue. They gave those items to the proper authorities for testing.

On March 7, 2001, Sergeants Pendergraff and Harshberger interviewed the petitioner. Sergeant Pendergraff asked him if he had ever been to the Owosso area in the 1970s. The petitioner stated that he used to go for long drives and had been to the Owosso area on a few occasions. He then asked him if he had met a friend or anyone else while in Owosso. The petitioner denied having

-8-

any friends there or meeting anyone there.  Sergeant Pendergraff asked the petitioner if he knew Magyar; he denied knowing her or anyone with that name.  Sergeant Pendergraff tried to show the petitioner Magyar's photograph, but the petitioner became visibly upset and stated that he did not want to see it.  The petitioner denied knowing anything about Shaw's gun.  Blood samples were taken from the petitioner on March 8, 2001.

After the petitioner was arrested, Virgil Kreinbrink contacted Sergeant Pendergraff.  Kreinbrink said he was at the Yankee store on January 27, 1973 buying a fishing reel.  Kreinbrink parked next to a truck.  He said he saw the petitioner.  He also observed a slim lady, who appeared to be wearing a suede jacket, in a maroon car, perhaps a Buick.  Kreinbrink did not remember the woman's hair being in a ponytail or tied with a scarf.  Something about the way the petitioner was looking down toward the woman's lap caused him to be concerned about her safety.  The petitioner looked shocked or surprised to see him.  The petitioner's car went north.  Kreinbrink claimed that he went to the state police and told them what he had seen in 1974 but never heard from them.  He contacted Sergeant Pendergraff again in April, 2001, after the petitioner was arrested.

Michigan State Police Forensic Scientist Ann Chamberlain, an expert in serology and biology, testified that she examined Magyar's clothing and the slides from her vaginal swabs for sperm.  Magyar's pants and vaginal slides had intact sperm present, suggesting that they were deposited very near to the time of her death.  Ordinarily, Chamberlain would have put the time at zero to six hours of being collected, but she said that the low temperatures would have a refrigeration-type effect on Magyar's body, thus stopping the degradation of the sperm.

Through the years of investigation, the police had excluded thirteen men as the source of the sperm found on Magyar's vaginal swab, including her husband.  Her husband also took a polygraph

test.  Even though the police looked at numerous suspects, no evidence linked them to the rape and murder.  The police also tested several weapons, but none was the murder weapon.

Dr. Glen Hall, a forensic scientist employed by the Michigan State Police crime laboratory and an expert in DNA analysis, tested one of the petitioner's cigarette butts from the trash pull.  He determined that the DNA profile from it matched the DNA profile from the sperm found on Magyar's vaginal swab.  According to Dr. Hall, the statistical probability of a random match to that profile was one in 15.9 quadrillion for the Caucasian population, one in 54.5 quadrillion for the African-American population, and one in 101 quadrillion for the Hispanic population.

Meghan Clement, a DNA analyst who worked for LabCorp, also determined that the DNA from the petitioner's blood matched the sperm taken from Magyar's vaginal swab.  It was her opinion that the odds of a statistical match were one in 14.4 quintillion.

No member of Magyar's family or her friends had ever heard of the petitioner.

Michigan State Police Sergeant Reinhard Pope, a firearms expert, examined the .22-caliber Rohm, along with the slugs retrieved from Magyar's body.  After removing the rust from the gun, Sergeant Pope was able to push bullets through its barrel and determined that their characteristics were similar to the slugs recovered from Magyar's body.  Because corrosion had destroyed those individual characteristics inside the Rohm barrel, he could not positively identify that weapon as having fired the slugs recovered from the body; he only could confirm that the samples were consistent.  Based on the Rohm's proximity to Magyar's wallet and the two Remington and the single Winchester shell casings found inside the Rohm, which were consistent with the two Remington and single Winchester bullets recovered from the body, Sergeant Pendergraff concluded that the Rohm was used to murder Magyar.

-10-

William Morrison and his girlfriend Karen Evans were called to testify about a robbery and rape perpetrated by the petitioner in the summer of 1961 near Ann Arbor, Michigan. They were on a date when they pulled off to the side of a remote gravel road to talk. A car pulled up and a man got out with a .22-caliber rifle and ordered them out of the car. The assailant ordered Evans to tie Morrison up with a rope but she could not because she was blind, so the man tied up both Morrison and Evans. The man took Morrison's wallet and told them that he had robbed a bank and needed a get-a-way car. He switched the position of his car with theirs, grabbed Evans, threw her in his car and left. Morrison freed himself and went to a nearby house to call the police. Morrison identified the petitioner in a lineup.

Evans testified that the petitioner told her he had a gun and that he was going to rape her. He stopped at a gravel road, removed her pants, and tried to penetrate her but did not. He then drove the car farther down the road, told her to get out, and had sexual relations with her while she stood against an embankment. He then made her lie down in a ditch, tied her legs, and left. He also took her panties. Evans eventually removed her bindings and made it to the road. A man stopped and took her to the police. She identified the petitioner as the man who raped her by hearing his voice.

Dr. Laurence Simson, Jr., an Ingham County medical examiner, testified for the defense. He said the time-frame in which intact sperm could be found after being deposited varied on the type of vaginal secretions a woman produced. However, he said that they could be found only up to eighteen hours later.

In rebuttal, Michigan State Police Department Forensic Scientist Connie Swander, a serology expert, testified that she completed a study in 1998 comparing the methodologies used for detecting semen. The highest concentration of sperm that began with ejaculation would last "as far as three

-11-

hours" and result in a finding of eighty percent or more of the sperm being intact.  Based on Chamberlain's findings that eighty to ninety percent of the sperm taken from Magyar's pants and vagina were intact, Swander opined that the depositor ejaculated shortly before her murder.  She believed Magyar's body acted "as a refrigeration unit," causing the sperm cells to remain intact.

Based on the evidence recounted above, the jury convicted the petitioner.  On direct appeal, the petitioner argued that the admission of other-acts and hearsay evidence was improper, the jury instructions were faulty, the prosecutor committed misconduct, identification testimony was improperly admitted, the destruction of certain trial exhibits deprived him of a meaningful appellate review,  the evidence was not sufficient to support the conviction, and the cumulative effect of the trial-court errors deprived him of a fair trial.  The court of appeals affirmed his conviction and sentence, *Wingeart*, 2003 WL 22204991, at *1, 10, and the Michigan Supreme Court denied his application for leave to appeal.  *People v. Wingeart*, 470 Mich. 856, 680 N.W.2d 420 (2004).  The petitioner's motion for reconsideration was denied on July 29, 2004.  *People v. Wingeart*, 471 Mich. 863, 683 N.W.2d 677 (2004).  The petitioner's petition for a writ of certiorari was denied on February 22, 2005.  *Wingeart v. Michigan*, 543 U.S. 1155 (2005).

The petitioner's habeas petition, filed in this Court on October 28, 2005, was stayed so he could return to state court to exhaust additional claims.  The petitioner returned to the state trial court and filed a motion for relief from judgment, which was denied on April 4, 2007.  *People v. Wingeart*, No. 01-6417-FC (Shiawassee Cnty. Cir. Ct. Apr. 4, 2007).   The petitioner's state court appeals were rejected.  *People v. Wingeart*, No. 283378 (Mich. Ct. App. Oct. 24, 2008); *People v. Wingeart*, 484 Mich. 864, 769 N.W.2d 671 (2009).

-12-

The petitioner's motion to reopen his habeas proceedings was granted on October 16, 2009.

The petitioner raised the following claims:

I.     ADMISSION OF THE HALLFORD LETTER AND MARINELLI'S OUT-OF-COURT STATEMENTS UNDER THE "RESIDUAL" HEARSAY EXCEPTION VIOLATED PETITIONER'S CONSTITUTIONAL RIGHT TO CONFRONT AND CROSS-EXAMINE ADVERSE WITNESSES. U.S. CONSTITUTIONAL AMENDMENT VI.

II.    THE STATE TRIAL COURT DEPRIVED PETITIONER OF HIS DUE PROCESS RIGHTS TO A FAIR TRIAL.  JUDGE GERALD D. LOSTRACO FAILED TO RECUSE HIMSELF SUE SPONTE FROM THIS CASE AT BAR IN SPITE OF HIS PROSECUTORIAL ROLE IN THIS CASE.  U.S. CONST. AMEND. V & XIV.

III.   PETITIONER WAS CONSTRUCTIVELY DENIED HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHEN HIS DEFENSE ATTORNEY FAILED TO (1) INVESTIGATE MATTERS CRITICAL TO THE DEFENSE AND (2) MOTION JUDGE LOSTRACCO TO RECUSE HIMSELF PRIOR TO TRIAL.  U.S. CONST. AMEND. VI.

IV.    PETITIONER'S APPELLATE COUNSEL WAS INEFFECTIVE FOR NOT INVESTIGATING AND PRESENTING THIS JUDICIAL BIAS ISSUE TO THE STATE APPELLATE COURTS ON DIRECT APPEAL.  U.S. CONST. AMEND. VI.

Br. in Support of Amend. Pet. at 9.

The respondent filed an answer contesting the merits and raising a procedural default defense to some of the issues.

The Court does not find it necessary to address the question of procedural default. It is not a jurisdictional bar to review of the merits of an issue, *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), and "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits," *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing

*Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). Application of a procedural bar would not affect the outcome of this case, and it is more efficient to proceed directly to the merits.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Under that review standard, mere error by the state court does not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

-14-

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court has explained that an unreasonable application of federal law is different from an incorrect application of federal law. Under that language, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The Supreme Court has continued to emphasize the limited nature of this review. In its unanimous decision two terms ago in *Harrington v. Richter*, --- U.S. ---, 131 S. Ct. 770 (2011), the Court reiterated that the AEDPA requires federal habeas courts to review state court decisions with "deference and latitude," and "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 785-86 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Sixth Circuit observed recently that "[t]his is a very high standard, which the [Supreme] Court freely acknowledges." *Peak v. Webb*, 673 F.3d 465, 472 (6th Cir. 2012). The *Peak* court suggested that

*Richter* holds that the review standard "is even more constricted than AEDPA's plain language already suggests." *Ibid.*

The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. The AEDPA thus imposes a highly deferential standard for evaluating state court rulings, and demands that state court decisions be "given the benefit of the doubt." *Renico v. Lett*, --- U.S. ---, ---, 130 S. Ct. 1855, 1862 (2010) (finding that the state court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached" (internal quotation marks and citations omitted)); *see also Peak*, 673 F.3d at 473-74; *Bray v. Andrews*, 640 F.3d 731, 737-39 (6th Cir. 2011); *Phillips v. Bradshaw*, 607 F.3d 199, 205 (6th Cir. 2010); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Rockwell v. Yukins*, 341 F.3d 507, 511 (6th Cir. 2003) (en banc). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, --- U.S. ---, 131 S. Ct. 1388, 1398 (2011).

## A.

In his first habeas claim, the petitioner argues that his rights under the Confrontation Clause were violated when the trial court admitted two testimonial statements concerning the source of the

firearm.  One statement came from Hallford and the other from Marinelli.  He argues that neither declarant had been subjected to cross-examination on their statements.

"The Sixth Amendment guarantees to a criminal defendant the right 'to be confronted with the witnesses against him.' U.S. Const. amend. VI." *Danner v. Motley*, 448 F.3d 372, 377 (6th Cir. 2006).  The Amendment applies to state court proceedings, *Pointer v. Texas*, 380 U.S. 400, 403 (1965), and it "provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination," *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987).

Since the petitioner's trial, the interpretation of the Confrontation Clause has undergone a radical transformation. *See Crawford v. Washington*, 541 U.S. 36 (2004).  The petitioner's reliance on *Crawford*, however, is misplaced because *Crawford* was decided after the petitioner's conviction became final, and it is not retroactive to cases already final on direct review.  *Whorton v. Bockting*, 549 U.S. 406, 409, 416-17 (2007); *Dorchy v. Jones*, 398 F.3d 783, 788 (6th Cir. 2005).  This Court, therefore, must examine the petitioner's claim of constitutional trial error under the law in effect at the time of the petitioner's direct appeal.

As of that time, the Supreme Court had held that the right of confrontation does not require "an actual face-to-face encounter at trial in every instance in which testimony is admitted against a defendant.  Instead, . . . the Clause permits, where necessary, the admission of certain hearsay statements against a defendant despite the defendant's inability to confront the declarant at trial." *Maryland v. Craig*, 497 U.S. 836, 847-48 (1990).  In *Ohio v. Roberts*, 448 U.S. 56 (1980), which was overruled by *Crawford*, the Supreme Court explained that the Confrontation Clause permitted the introduction of hearsay testimony only when (1) the declarant is unavailable to testify and (2)

-17-

the testimony bears "adequate indicia of reliability." *Id.* at 66.  Those indicia of reliability must be inherent in the statement itself and the circumstances under which it is made, without reference to corroborating or other evidence at trial.  *See Idaho v. Wright*, 497 U.S. 805, 822 (1990).  "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.  In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness."  *Roberts*, 448 U.S. at 66.  The examples of "firmly rooted" hearsay exceptions offered by *Roberts* included dying declarations, cross-examined prior trial testimony, and preliminary hearing testimony given under oath.  *Id.* at 66 n.8.

The petitioner's challenges focus on two out-of-court statements.  The first is Hallford's letter, which referenced Stone's pawn shop records.  Hallford testified at trial, so there can be no Confrontation Clause violation concerning any out-of-court statements he may have made.  Stone could not be located, however, and his statement to Hallford fit the definition of hearsay, inasmuch as it was offered to show the provenance of the firearm.

The petitioner also challenges Barnes's testimony that ATF Agent Marinelli told him that the .22-caliber Rohm was manufactured in Germany and shipped to Saligen & Liberty Arms Company in LaCrescenta, California and, in turn, sold to Jim's Pawn Shop in Yuma, Arizona.  Once again, Marinelli's out-of-court statement was offered to prove the truth of its substance and constituted hearsay.

The trial court admitted the statements under Michigan's residual hearsay exception.  Mich. R. Evid. 806 (now 807).  The state court of appeals found no fault with the ruling:

> Here, regarding the letter, the record demonstrates that the author of the letter could confirm his signature, but had no recollection of the investigation or information contained in the letter.  The person with whom the author of the letter had spoken, the pawnshop owner, and whose hearsay was recorded in the letter could not travel

-18-

for health reasons and had no reason to fabricate the information that he told to the police. The letter was written in 1974, before defendant was a suspect. With regard to the ATF agent's statements, a detective sergeant with the state police testified before trial that he contacted the ATF agent, but the ATF agent had no independent recollection of running the trace, and the detective sergeant further testified that there is no paperwork concerning the gun because paperwork is only retained for twenty years.

Considering the totality of the circumstances as to both, we find that the statements in question had particularized guarantees of trustworthiness, were offered as evidence of a material fact, were more probative on the topic for which they were offered than other evidence that could have been procured, especially in light of the passing of time between the murder and the charging of defendant, and there is no indication that the general purposes of the rules or the interests of justice were not served by the admission of the statements. It does not appear that cross-examination would have been of more than marginal utility. Consequently, the trial court did not abuse its discretion in admitting the challenged evidence, nor was defendant denied his constitutional rights.

*People v. Wingert*, 2003 WL 22204991, at 88-9.

The Court cannot say that the state court's decision violated pre-*Crawford* Confrontation Clause jurisprudence. The appellate court assessed the appropriate factors and found that the statements bore adequate indicia of reliability and were made by unavailable declarants. But even if the statement was erroneously admitted, habeas relief is available only if the error was not harmless. *Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003). The state court did not address that question or cite *Chapman v. California*, 386 U.S. 18 (1967), which sets forth the rule that the states must apply on direct review when evaluating the effect of non-structural constitutional error in criminal proceedings. However, the Sixth Circuit has retooled the standard of review of harmless error decisions in habeas cases in light of new Supreme Court precedent:

In *Fry* [*v. Pliler*, 551 U.S. 112 (2007)], the Supreme Court held that a federal habeas court "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* [*v. Abrahamson*], 507 U.S. 619 . . . [(1993)], whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond

-19-

a reasonable doubt' standard set forth in *Chapman* . . . ." 127 S.Ct. at 2328. *Fry*, 127 S. Ct. at 2326-27, therefore overruled *Eddleman* [*v. McKee*], 471 F.3d [576,] 583 [(6th Cir. 2006)], where we concluded that "AEDPA replaced the *Brecht* standard with the standard of *Chapman* plus AEDPA deference when, as here, a state court made a harmless-error determination." To resolve the harmless error issue, we now must ask whether the constitutional violation "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). If "'the matter is so evenly balanced' that this Court has 'grave doubt' as to the harmlessness of the error, it 'should treat the error, not as if it were harmless, but as if it affected the verdict ( i.e., as if it had a 'substantial and injurious effect or influence in determining the jury's verdict')." *Stapleton v. Wolfe*, 288 F.3d 863, 867 (6th Cir. 2002) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435 (1994)).

*Vasquez v. Jones*, 496 F.3d 564, 575 (6th Cir. 2007).

Harmless error for a Confrontation Clause violation is assessed using a five-factor test. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (considering "a host of factors," including (1) "the importance of the witness' testimony in the prosecution's case," (2) "whether the testimony was cumulative," (3) "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points," (4) "the extent of cross-examination otherwise permitted," and (5) "the overall strength of the prosecution's case" (citing *Harrington v. California*, 395 U.S. 250, 254 (1969))). The Court cannot conclude that the evidence of the firearm's history had a substantial and injurious effect or influence in determining the jury's verdict; the Court has no "grave doubt" as to the outcome of the case. The trial record shows that the petitioner's sperm was found inside Magyar's vaginal cavity. Kreinbrink identified the petitioner as being at the Yankee Plaza parking lot with a woman wearing a suede jacket. The fact that Magyar did not leave voluntarily with the petitioner is confirmed by the scattering of the keys inside and outside the truck. In addition, Barnes could have testified that, knowing the Rohm's serial number, he contacted the ATF and, then, the Panama City police. No hearsay would be presented by such testimony. Likewise, Pendergraff and

-20-

Harshberger both testified about their efforts to locate Robert Shaw without any reference to information obtained from Stone or Marinelli.

Furthermore, Robert Shaw properly testified that he purchased a .22-caliber Rohm in Yuma, Arizona, and it was in his possession at some point before his divorce from Rossow in 1969 and before Rossow's marriage to the petitioner. The petitioner's possession of a small handgun was confirmed by his friend Tony Bennett, who testified that in 1971 or 1972 that the petitioner brought such a gun to his house and shot at some cans.

The .22-caliber Rohm was found in the same river as Magyar's wallet, two miles from where she was abducted and within miles of where she was murdered. It contained a misfired bullet, two unfired bullets, and two Remington shell casings as well as one Winchester shell casing, matching the type of bullets retrieved from her body.

Despite being friends with Patterson, the petitioner denied having a friend in the Owosso area, but admitted that he went for long drives there during the pertinent time frame. The petitioner denied knowing Magyar and became visibly upset when confronted with her picture.

The Court does not believe that the state court's determination of the constitutional issue was unreasonable and it did not misapply Supreme Court precedent. Moreover, the strength of the evidence in the case rendered any Confrontation Clause error harmless. The petitioner is not entitled to relief on these claims.

## B.

In claim two, the petitioner alleges that he is entitled to habeas relief because the trial judge was biased because he was the elected county prosecutor during some part of the lengthy investigation. It appears that the trial judge served as prosecutor from 1973 through 1980. The

-21-

petitioner did not ask the judge to recuse before trial. Instead, he raised the issue in his post

conviction motion. The judge denied that motion from the bench on April 2, 2007, stating:

> This judge was not part of any of that effort in terms of going out into the community
> or the area where perhaps there was a search going on. I'm not sure who that was
> but, in any event, there was no participation on my part.
>
> To my knowledge, there was not even any participation on the part of the Shiawassee
> County Prosecutor's Office in any proceedings in this case because, to my
> knowledge and by my recollection, there was no evidence that was presented by the
> investigative agency, which I believe was the Michigan State Police. The
> Prosecutor's Office was not the investigative agency, as you have alleged in your
> argument, for any time, whether it was 1973 or for the six or eight years that I was
> in the Prosecutor's Office after the murder that you committed.
> . . .
> So the motion is denied because it's ungrounded, it's unfounded on any evidence, it
> lacks — totally lacks merit, and wherein you state in your brief, for example, that
> "Judge Lostracco being the former prosecutor on the incident case for eight years
> surely qualifies." I'm looking at Page 6 of your brief, quote, "The record" — I'm
> reading from your brief. "The record supports an undisputed fact, Defendant was
> denied his due process rights to a fair trial by a judge with a factual predisposition
> to abuse — to abuse his discretion, discretion tainted by clear involvement while
> acting as prosecutor on the same case."
>
> And again, you know, it's one thing for you to bring the motion; and you have every
> right to do so. But it's another thing for you to misrepresent the record by stating
> that I was a former prosecutor on the incident case for eight years. I had nothing to
> do with this case as prosecutor, to my knowledge, neither did the office during the
> years of 1973 through 1980. So your motion is denied as groundless.

Mot. Hr'g Tr., 16-17, Apr. 2, 2007, ECF No. 59-3.

The Due Process Clause of the Fourteenth Amendment requires a fair trial in a fair tribunal

before a judge with no actual bias against the defendant or an interest in the outcome of the case.

*See Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997). Judicial bias claims involve two types of cases.

One group addresses charges of bias stemming from a trial judge's "personal interest" in the

outcome of a case, usually derived from some extrajudicial association with the cause or with one

of the parties. *See In re Murchison*, 349 U.S. 133, 136 (1955). The second group concerns charges

-22-

of "judicial misconduct" in which the trial judge is accused of conducting the proceedings in a manner that strongly suggests that the judge disbelieves the defense or favors the prosecution. *See Liteky v. United States*, 510 U.S. 540, 555-56 (1994); *see also Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002). It is not clear which form of bias the petitioner alleges here, but the record supports neither.

To violate a defendant's right to a fair proceeding, the judge's intervention in the case must be significant and detrimental to the defendant to a substantial degree. *See McBee v. Grant*, 763 F.2d 811, 818 (6th Cir. 1985). Adverse rulings themselves are not sufficient to establish bias or prejudice. *See Liteky*, 510 U.S. at 555 ("judicial rulings alone almost never constitute a valid basis for a bias or partiality motion"); *United States v. Hynes*, 467 F.3d 951, 960 (6th Cir. 2006) (citation omitted). The Supreme Court cautioned that "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display," do not establish bias or partiality. *Liteky*, 510 U.S. at 556.

The instances cited by the petitioner to support this claim do not reflect bias. The trial court's decisions appear to have been formed on the basis of events occurring during the course of the proceedings and did not display favoritism or antagonism. The record is devoid of evidence suggesting that the trial judge was a former investigator on the case or had any personal interest in the outcome of the case. The record does not support a finding that he had a predisposition to rule favorably for the prosecution, as the petitioner suggests. The petitioner has not produced any evidence to support his claim. Instead, he has attached several articles and other documents showing that the trial judge previously served as an assistant prosecutor and prosecutor during the time that

Magyar's murder remained unsolved. Without more, there is no basis for the judge to have been disqualified.

The Court concludes that the state trial court's resolution of this claim is not contrary to or an unreasonable application of clearly established Supreme Court precedent. Because there is no evidence of bias, habeas relief in not warranted on this claim.

### C.

In claim three, the petitioner contends that he was constructively denied his constitutional right to the effective assistance of trial counsel because counsel failed to investigate matters critical to his defense and failed to file a motion to have the trial judge recuse himself prior to trial.

The two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs the Court's analysis of ineffective-assistance-of-counsel claims. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). To establish ineffective assistance of counsel 'a defendant must show both deficient performance and prejudice." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009); *see also Premo v. Moore*, 562 U.S. ---, ---, 131 S.Ct. 733, 739 (2011) (same).

Because of the high deference accorded state-court determinations by the AEDPA, establishing that counsel was ineffective, and therefore the petitioner was denied his right to counsel under the Sixth Amendment, is difficult. "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ---, ---, 130 S.Ct. 1473, 1485 (2010). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S. at 690.

> Establishing that a state court's application of *Strickland* was unreasonable under [section] 2254(d) is all the more difficult. The standards created by *Strickland* and [section] 2254(d) are both "highly deferential," [], and when the two apply in tandem, review is "doubly" so, []. The *Strickland* standard is a general one, so the

-24-

range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under [section] 2254(d). When [section] 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at ---, 131 S.Ct. at 788 (internal citations omitted).

On habeas review, "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable — a substantially higher threshold.'" *Knowles*, 556 U.S. at 123 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Moreover, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Ibid.* (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Here, the petitioner contends that his trial counsel failed to investigate the trial judge's activity as a former prosecutor and move for his recusal. But the trial judge had no involvement in the petitioner's case while he was a prosecutor, so there is no factual basis for the bias claim. Counsel cannot be deemed ineffective for failing to make a futile motion or objection. *United States v. Steverson*, 230 F.3d 221, 225 (6th Cir. 2000). Moreover, it appears from the petitioner's letter attached to his brief that trial counsel was aware that the trial judge was in the prosecutor's office during the time that Magyar's murder remained unsolved. Counsel's decision to not draw attention to the matter likely was strategic. As the Supreme Court has explained, "[t]here comes a point where a defense attorney will reasonably decide that a [certain] strategy is in order, thus making particular investigations unnecessary. Those decisions are due a heavy measure of deference." *Cullen*, 131 S. Ct. at 1407 (reversing grant of habeas relief on ineffective assistance of counsel claim) (citations omitted).

-25-

As such, trial counsel was not ineffective by failing to move to disqualify the trial judge, and the petitioner cannot establish that he was prejudiced in any way. He was not denied the effective assistance of trial counsel.

D.

In claim four, the petitioner argues that his appellate lawyer was ineffective for not investigating and presenting his judicial bias claim to the state appellate courts in his direct appeal. That claim lacks merit as well.

The right to the effective assistance of counsel extends to a defendant's direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). It is important that appellate counsel undertakes a thorough review of the record and selects the most promising issues for review. *Jones v. Barnes*, 463 U.S. 745, 752 (1983). Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones*, 463 U.S. at 751-52). Appellate counsel thus need not raise every nonfrivolous issue, but he must exercise reasonable professional judgment. *See Evitts*, 469 U.S. at 394 (appellate counsel is not required to raise every available argument, regardless of merit); *see also Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (citing *Jones*, 463 U.S. at 751-53) (same).

The Sixth Circuit has held that the determination of whether appellate counsel performed deficiently should be assessed in light of several well-known factors that include assessments of the importance of the omitted issue, whether it was preserved in the lower court record, the standard of

-26-

review, and the client's involvement in making choices. *Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th Cir. 1999); *see also Franklin v. Anderson*, 434 F.3d 412, 429 (6th Cir. 2006). After reviewing those factors, the Court is convinced that appellate counsel's choices were reasonable. The record reveals that appellate counsel presented six primary issues on appeal and he filed a forty-five-page brief addressing those six claims. The claims, although not successful, were well presented; the documentation establishes appellate counsel's proficiency. Appellate counsel apparently made a strategic decision to omit the judicial-bias claim based on the trial judge's lack of involvement in any aspect of the Magyar case.

Appellate counsel cannot be deemed constitutionally deficient by not raising the bias claim on direct appeal. Nor can the petitioner show that he was prejudiced by appellate counsel's failure to raise the meritless claim on appeal.

### III.

The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States. The state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the amended petition for a writ of habeas corpus is **DENIED.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  February 22, 2013

-27-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 22, 2013.

s/Deborah R. Tofil
DEBORAH R. TOFIL